Rebecca **THOMAS**, Plaintiff,

v.

**COOPER INDUSTRIES, INC., and Plumb—the Cooper Group, Defendants.**

No. C–C–84–460–M.

United States District Court, W.D. North Carolina, Charlotte Division.

Jan. 31, 1986.

George Daly, Charlotte, N.C., for plaintiff.

Frank B. Aycock, III, Charlotte, N.C., and Curtis L. Mack, Atlanta, Ga., for defendants.

REVISED MEMORANDUM OF DECISION (REPLACING THE MEMORANDUM OF DECISION FILED 12/31/85)

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

This case was tried by the court without a jury in Charlotte from September 11 to September 16, 1985. The parties submitted proposed findings and conclusions. Based upon the testimony at the trial and upon a thorough later review of the proposals of the parties, the court's notes and the trial exhibits, the court makes the following findings of fact and conclusions of law.

### I.

### FINDINGS OF FACT

A. *Denial of Promotion.*

1. On August 16, 1984, the plaintiff, Rebecca Thomas, filed this suit against the defendants, Cooper Industries and Plumb— The Cooper Group, alleging that defendants denied her a promotion and constructively discharged her on account of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (She had filed timely charges with the United States Equal Employment Opportunity Commission (EEOC) (plaintiff exhibits 28, 29), and had received a "right to sue" letter at the end of July, 1984 (plaintiff exhibit 30).)

2. Plaintiff is a forty-three-year-old married woman and has one child. In October, 1981, she was hired by defendants to be personnel assistant at the Plumb Plant in Monroe, North Carolina (Plumb). She was the third employee hired. Alexander Young, the plant manager, was the first, and Charlie Sturgis, the employee relations manager, was the second.

In February of 1982, plaintiff was promoted to personnel supervisor. Charlie Sturgis was fired as employee relations manager in March, 1983, and plaintiff then became the acting employee relations manager. She applied at that time for the employee relations manager position. In July, 1983, Ed. Sherbert became the employee relations manager, and plaintiff reverted to personnel supervisor. On October 14, 1983, plaintiff resigned. Since then, she has been the personnel manager for the Kendall Company in Lumberton,

North Carolina, where she is responsible for over 1,000 employees.

Plaintiff's family home is in Peachland, North Carolina, which is near the Plumb plant. Since she took the job with Kendall, however, she has lived during the working days of the week at Lumberton, 100 miles or more from her home in Peachland.

3. Defendant Cooper Industries (Cooper) is a Texas corporation which has manufacturing facilities and other operations throughout the United States. Cooper and its various divisions employ approximately 50,000 persons and affect commerce. Defendant Plumb—The Cooper Group is the division of Cooper Industries that runs the Plumb plant in Monroe, North Carolina. The Plumb plant manufactures "striking tools" such as hammers and axes under the "Plumb" name (plaintiff exhibit 4, p. 4). At the time of the events in issue (and still today), it employed over 200 persons (see plaintiff exhibit 16) and affected commerce. For each of the four quarters prior to 1983, it employed more than 15 people.

4. A central tenet in the defendants' business philosophy is avoiding unionization of their plants. Indeed, the decision to move the Plumb plant to Monroe in 1981 was based largely on the fact that unions were not popular or powerful in the area.

One of the primary things that defendants do to avoid unionization of their plants is attempt to foster a positive relationship between employees and management. The employee relations manager is a crucial person in this effort and in the effort to avoid unionization in general (plaintiff exhibit 6).

5. The "Experience and Training" required to perform the employee relations manager job (plaintiff exhibit 6, p. 2) were:

"1. Must be a college graduate with a Bachelor's Degree in Business Administration, Personnel, or equivalent in working experience.

"2. Requires 5 to 8 years experience in personnel work with 3 years in supervision.

"3. Course study in areas of Industrial Management, Personnel Relations, and Psychology desirable.

"4. Must have attended Human Relations skills seminars or workshops."

6. Carl Plesnicher, Cooper Industries' vice president for employee relations, and Larry Polsky, vice president for personnel, testified that an unstated requirement for employee relations manager was experience in a manufacturing facility other than Plumb.

The court finds no hint of this requirement in the employee relations manager job description (plaintiff exhibit 6). Nor was it shown that this requirement was ever applied to any applicant other than plaintiff.

The court does not credit Plesnicher's and Polsky's testimony, and finds that experience in a manufacturing environment other than Plumb was not a requirement for the position of employee relations manager.

7. Plaintiff met the requirements for employee relations manager. She had a bachelor of science degree in business. She had worked in personnel since 1967, and nine years of that time (from 1967 to 1976) had been in a supervisory capacity. She had had course study in the appropriate areas and had attended the requisite workshops (plaintiff exhibits 10 and 12).

8. A closer look at plaintiff's background (her resumés are plaintiff exhibits 10 and 12) show that in fact she was exceptionally well qualified.

While she was at Wingate College in Wingate, North Carolina, where she received her B.S. degree, plaintiff was on the Dean's List and received the Poplin Scholarship as the outstanding business student. She graduated *cum laude.*

Plaintiff also has a special studies certificate from Queen's College in Charlotte, North Carolina. Her emphasis at Queen's was pension, profit-sharing, employee benefits, investment, and estate planning.

Plaintiff's work experience before joining Plumb was also outstanding.

From 1967 to 1976, plaintiff was office manager and personnel supervisor for the Life Insurance Company of Virginia office in Charlotte, North Carolina. She directly supervised three clerical and 25 to 35 sales people. Her responsibilities included recruitment of sales and clerical employees for the regional office; administration of company benefits, policies and procedures; salary administration; and insuring compliance with EEOC, OSHA, and affirmative action regulations. Further, she coordinated the orientation and training of the sales force and assisted in reorganization and combination of two Life Insurance Company of Virginia offices.

In 1970, while still with Life Insurance Company of Virginia, plaintiff helped Norman Cotter, the head of the Life Insurance Company of Virginia office, set up Cotter & Associates. This company essentially operated as the personnel department for employers too small (fewer than fifty employees) to have their own personnel departments. Plaintiff was a managing director and partner in Cotter & Associates for three years. Her responsibilities included establishing a client personnel service that would recommend and administer fringe benefit programs. The personnel service also conducted employee attitude and opinion surveys; helped improve employee-management communication; trained employers in methods for maintaining non-union status; and insured compliance with EEOC, ERISA, and OSHA regulations as well as regulations of the Securities and Exchange Commission. While with Cotter, plaintiff recruited, trained, and supervised a work force that grew from two to fifteen full time and part time employees.

Plaintiff left Cotter in 1975 and Life Insurance Company of Virginia in 1976 and became a full time student at Wingate College. While a student, plaintiff worked for Wansona Manufacturing Company in Wadesboro, North Carolina. She worked three days a week during the school term and full time the rest of the year. During her four years at Wansona, plaintiff had many roles and responsibilities. As administrator of the pension and profit-sharing plans, she was responsible for ERISA approval, trustee record keeping, orientation of new participants, and counseling of prospective retirees on retirement planning. As management leader on the safety committee, she coordinated hourly workers and management in identifying and eliminating hazards. As assistant to the marketing vice president, she was liason between plant technicians and customer service and a member of the in-house newspaper staff. As executive secretary to the controller, she administered compensation for over 400 employees, took wage surveys, and completed stockholder, operations, and corporate tax reports.

9. Plaintiff had further qualifications for the job. She was a long time resident of the area and knew it and the local people well. This was a highly useful characteristic for an employee relations manager in general but was especially useful for the employee relations manager of a start-up plant such as Plumb. Plaintiff also was direct, honest and fair, and was a very hard worker. She related well to people and was an outstanding interviewer. And she, as her testimony and demeanor at the trial showed, could be tough as nails when she had to be.

Alex Young, the plant manager at Plumb, thought plaintiff was the "top candidate" for Charlie Sturgis's job (plaintiff exhibit 10) and was "qualified without question." Sturgis himself had said she was "ideally suited" for employee relations (plaintiff exhibit 7).

10. Plaintiff had still another outstanding qualification for the job; she had been doing it, or most of it, already.

Plaintiff had begun to assume most of the duties of employee relations manager in 1982, long before Charlie Sturgis was fired. This was because Sturgis spent more than three-fourths of his job time either on public relations or on personal affairs. Among other things, he spent considerable time walking through the plant each day speaking with employees. He

left the "nuts and bolts" of his job to plaintiff. That is why he was fired.

11. Some of the employee relations manager's duties that plaintiff assumed were the following:

(a) She prepared the Plumb Employee Handbook which was given to new employees (plaintiff exhibit 4). The handbook contained information, including the crucial information about the plant's non-union status, that employees needed.

(b) She wrote the job descriptions for the non-exempt positions.

(c) She rated the jobs in the plant according to the Hay System (see plaintiff exhibit 25, p. 3) for purposes of compensation.

(d) She set up the procedures for hiring new employees. As part of this, she prepared a standard form application for Plumb (plaintiff exhibit 5), and she worked with the North Carolina Employment Security Office. That office tested and screened applicants for the plant. Also as part of this, plaintiff set up training classes for the screened applicants. She did some of the presentations at the training sessions.

(e) She set up and coordinated programs to encourage communication in the plant. These included open forum meetings and a newsletter. These programs were regarded as very important in the plant's effort to remain non-union.

(f) She set up employee fringe benefit programs such as life insurance and pension plans.

(g) She wrote the monthly employment activity report which went to the Raleigh and Houston offices of the defendants (*see, e.g.*, plaintiff exhibit 16).

(h) She set up procedures to be followed whenever accidents occurred.

(i) She set up in-house training seminars.

12. Plaintiff not only did both her job and much of her boss's job; she did them well. Sturgis, with the concurrence of Alex Young, the plant manager, rated her "commendable" in November, 1982 (plain-tiff exhibit 7). The company definition of that rating was

"performance pursuant to expectations is substantially above average. Level of accomplishment reflects a high degree of proficiency, and measurably surpasses that required for acceptable completion of established goals and objectives"

(plaintiff exhibit 7). Only about ten to fifteen percent of defendants' exempt employees were rated commendable.

On the appraisal form, Sturgis wrote: "Becky has been instrumental in maintaining a high level in quality in our new employees and has handled our personnel programs (or assisted) in a very professional manner—she works well with the various members of management and employees as well. She maintains a very positive attitude and is *ideally suited* for Employee Relations—She also has helped organize the Employee Relations Department to what I feel is one of the best in the group"

(*id.* (emphasis added)).

Sturgis also wrote under "other jobs for which this individual may qualify ... within the next 12 month period" that "with continuing training and exposure, [plaintiff] could assume additional management responsibilities" (*id.*). That was almost four months before his position came open and eight months before Ed. Sherbert was hired to fill it.

13. In February 1983, Sturgis lowered plaintiff's rating to "good," which meant "performance pursuant to expectations satisfactory.... requires no more than normal supervision or assistance" (*id.*). This rating did not reflect a decline in plaintiff's performance or ability. It reflected the fact that Sturgis was angry that Alex Young had rated *him* only a "fair." Sturgis told Young, who thought plaintiff should be rated "commendable," "If I'm only 'fair,' she is only 'good.'"

14. Alex Young said that plaintiff was ready to replace Sturgis as of January, 1983, if not earlier. Indeed, on the January evaluation of Sturgis, Young had listed

plaintiff as a replacement possibility who was "Ready Now" (plaintiff exhibit 9).

15. When Young fired Sturgis in March, 1983, he wanted to make plaintiff the employee relations manager. Dick Campbell, the vice president of operations for Cooper *Group* and Young's immediate superior, told Young he thought that was a good idea. Campbell even told plaintiff on a visit to Plumb in March, 1983, that he was behind Young's plan and that everybody in Raleigh, Cooper Group's headquarters, and Houston, Cooper Industries' headquarters, knew she was outstanding.

Young did not, however, make plaintiff the employee relations manager in March, 1983. Larry Polsky, the vice president of personnel for Cooper Industries, directed Young to make her the *acting* employee relations manager. Polsky requested additional information on plaintiff.

16. On March 29, 1983, Young sent Polsky a package that contained (1) the resumé plaintiff had used in 1981 when applying to Plumb; (2) the January, 1983, evaluation of plaintiff; and (3) statements from plaintiff's references (plaintiff exhibit 10). The evaluation showed that plaintiff had gone well beyond her performance objectives for 1982. Instead of simply assisting in the preparation of the employee handbook and assisting with training and orientation of new employees, plaintiff had prepared the handbook and managed the orientation and training (*id.* at 4). The resumé showed briefly the experience that plaintiff had prior to coming to Plumb. The reference statements showed that she was "an excellent employee"; that her work was "highly satisfactory" (*id.* at 11); and that she was "efficient," "conscientious" and had "no weakness of any type" (*id.* at 12).

17. In the cover letter Young wrote: "Along with the above, I would like to add my two cents. Becky joined us in October of 1981 as our first local (other than Charlie) employee. Since that time, she has directed the employee relations department, interviewed, hired, terminated, updated and written local employee relations policies, prepared employee handbook, applications, and job descriptions, published newspaper, completed wage surveys, and various employee activities, been sole administrator of the salary program, organized the pre-employment training classes and gained the respect, cooperation and support of the people at the Plumb plant both salaried and hourly alike. Is completely fair and deals with personnel situations with firm resolution.

She is the top candidate for the position as Manager of Employee Relations, and I solicit your support to this end." (*Id.* at 1.)

18. About the time Young sent this package to Houston, plaintiff prepared an updated and expanded resumé (plaintiff exhibit 12). This resume included her experience as acting employee relations manager and as personnel supervisor at Plumb, and went into greater detail about her pre-Plumb experience than the old resumé had. Young sent this resumé to Houston also.

19. Carl Plesnicher, vice president for employee relations, did not want Young to hire plaintiff. He told Young over the telephone that there was "no way" a woman could stand up to a union.

20. Plesnicher denied telling Young that a woman could not stand up to a union. He testified that he reviewed the materials in Young's letter to Polsky and found plaintiff "not even close" to qualified for employee relations manager. That is why, he said, plaintiff was never even interviewed for the job.

Plesnicher said plaintiff was not qualified because her experience was predominantly clerical. He was not certain that he had reviewed the updated resumé before or after he reached this conclusion. He told the court, however, that the updated resumé changed nothing.

When plaintiff's extensive experience in personnel (supervisory and otherwise) was pointed out to Plesnicher, he said she had to have experience in a manufacturing context. When he was reminded of her experi-

ence at Plumb, he said the experience had to be outside of Plumb!

The court finds that Plesnicher was evasive and not believeable on the witness stand. The court finds that Plesnicher did not seriously review the information on plaintiff. Had he reviewed it even cursorily, he would have found that plaintiff was fully qualified to be employee relations manager at Plumb. Plesnicher's reasons for not considering, interviewing, and hiring plaintiff are pretextual.

21. Larry Polsky also testified that he found plaintiff unqualified after reviewing the material sent by Young. The court does not believe that Polsky seriously reviewed the materials and considered plaintiff.

22. Plesnicher, never having seriously considered plaintiff for the job, urged Young to interview Ed. Sherbert (defendant exhibit 33).

23. Young interviewed Sherbert in late May. He found Sherbert "a cut above" regular people and did not think he would relate well with employees. Young did not offer Sherbert the job.

24. Plesnicher and Dick Campbell (vice president of operations for Cooper *Group* and Young's immediate supervisor) were disappointed that Young had not hired Sherbert. Campbell called Young from Raleigh and "strongly suggested" that Young interview Sherbert again and offer him the job. Campbell told Young that if he did not, Campbell would get someone who would.

25. Young interviewed Sherbert again in early June. However, he did not offer him the job. In his opinion, Sherbert had no more to offer than plaintiff and in fact was weak in salary administration and budgeting (*see* defendant exhibit 10, p. 6), two areas that are very important for a new plant and in which plaintiff excelled. Young saw no reason to bring in an outsider who was unfamiliar with the plant and the area and to pay relocation expenses (these amounted to $27,000) when a perfectly qualified person, plaintiff, was already there. Furthermore, he saw no need to add anyone to the employee relations department ("Why pay two salaries when one will do it?").

26. On June 13, 1983, Campbell fired Young for refusing to "back off" on having plaintiff as employee relations manager. That same day, Bert Hackett took over as plant manager of Plumb.

27. In late May, before Young was fired, several officials of Cooper Industries visited the Plumb plant. Among these officials were Alan Riedel, a senior vice president, and Polsky.

Young had twice requested that two people in Houston interview plaintiff for the employee relations manager position, but they did not do so on this trip or at any other time. Just before they were to leave, however, Young took them by for a five- or ten-minute visit with plaintiff. During this short meeting, Riedel asked plaintiff what she would do if a union tried to organize the plant. Plaintiff answered that she would refuse to speak to the organizers and would call Raleigh and Houston. Riedel then asked if plaintiff could say "no" to one of those big forgers out there. Plaintiff said, in effect, that if it was a question of size, "you'd better call in the Dallas Cowboys." In his deposition, Riedel said the question he had asked was standard. He could not, however, remember whether he asked it of Ed. Sherbert.

28. After the brief visit with plaintiff, Riedel told Young that he thought plaintiff was attractive and seemed to have the situation well in hand but "We haven't had much success with female personnel managers in the South" (*see* plaintiff exhibit 28).

29. The evidence shows that the Cooper Group had not had a female personnel manager anywhere from at least as early as January 1, 1980, through at least as late as July 1, 1985 (plaintiff exhibit 25). Larry Polsky, who was in a position to know, could not name a single *female* who had held the position of assistant employee relations *manager*. Assistant employee relations manager is a feeder position for em-

ployee relations manager; Polsky thought Diane Amick was one such, but she was not (see plaintiff exhibit 48, p. 1). Nor, on the other side of the coin, could Polsky name a single *male* who had held the job of personnel *supervisor,* plaintiff's position.

30. After Riedel returned to Houston, he wrote to Dick Campbell concerning Young's authority to fire the future employee relations manager. The letter stated in part, "I think we should agree that Alex Young does not have unilateral freedom to terminate the *man* who is put in...." (plaintiff exhibit 41 (emphasis added)).

31. Soon after Bert Hackett replaced Young, plaintiff approached Hackett about interviewing for employee relations manager. Hackett told her he was too busy. He never interviewed her for the job.

32. In early July, 1983, Hackett told plaintiff that he needed "a *fellow* for the job with a strong second person" (emphasis added).

33. Hackett offered Sherbert the job in early July. Sherbert began work on July 11, 1983.

34. The court finds that Ed. Sherbert was not as qualified as plaintiff for the employee relations manager job at the Plumb plant.

Sherbert had a slight educational advantage. He had an M.B.A. degree in industrial relations from the University of West Florida. His work experience, however, was substantially less than plaintiff's. He had eight years supervisory experience in personnel (December 1973 to July 1983) (defendant exhibit 22), while plaintiff had at least nine years (from 1967 to 1976) (plaintiff exhibit 12). Most significantly though, he had no non-supervisory experience in personnel. Plaintiff of course had had five years of non-supervisory experience in personnel (1976 through 1981). Sherbert was not strong in salary administration and budgeting (defendant exhibit 10, p. 6); he had not lived in the area; and he did not already have the job.

35. Plesnicher and Polsky testified that they had to make Sherbert the employee relations manager *at Plumb* or the company would lose him. The court finds this is not correct. From December 31, 1982, until March, 1984, the group employee relations director position at defendant Cooper Group's headquarters in Raleigh, North Carolina, was open (compare plaintiff exhibit 43 to plaintiff exhibit 42, p. 3). Further, as of May 18, 1983, Plesnicher and Polsky knew that Roy Hoxworth, the employee relations manager at the *Sumter, South Carolina,* plant, would soon be promoted to a position in another plant, and therefore that his position would be open shortly (see plaintiff exhibit 40). These positions were rated equal to the position at Monroe (plaintiff exhibit 25), and Sherbert was qualified for both. He could have been given either position.

36. The reason defendants did not promote plaintiff to employee relations manager was that she is a woman. The reasons offered by the defendants for not making plaintiff the employee relations manager (and for not even *interviewing* her for the job) are pretextual and are not the real reasons.

37. The court further finds that had plaintiff not been female, defendants would have made her the employee relations manager at Plumb by April 1, 1983.

B. *Constructive Discharge.*

38. Dick Campbell (vice president of operations for the Cooper Group) told plaintiff in late June or early July that Ed. Sherbert was going to be hired but that plaintiff would be made the assistant employee relations manager.

39. Instead of being made assistant employee relations manager when Sherbert came on board, plaintiff reverted to personnel supervisor. In October, Hackett told plaintiff that the plant was too small for an assistant employee relations manager and that the employee relations department had too many people in it already.

40. Hackett was very unfriendly toward plaintiff while she was at Plumb. He

would actively avoid her in the halls and once actually shut the door of his office in her face. This made plaintiff very uncomfortable.

41. On June 24, 1983, while plaintiff was still the acting employee relations manager, Hackett verbally abused her within sight and sound of a class of applicants. This happened when plaintiff sent Hackett the monthly employee activity report that she intended to send to Raleigh and Houston. Hackett became very angry over the first paragraph of the report. He came across the street to the training building and called plaintiff out of a seminar she was giving for a class of applicants. He was visibly upset and, with the door to the seminar open, loudly said to her "Lady if you send that report, you'll get Houston on my back, and if you do, you're through." The applicants in the seminar almost certainly could see and hear Hackett. Plaintiff felt "belittled and embarrassed."

The part of the report that Hackett objected to read:

"The labor relations at Plumb are strained due primarily to the replacement of the Plant Manager. This, added to previous top level changes in Controller, Employee Relations Manager, and Materials Manager, hinders the credibility of our 'family' image we have promoted among our entire workforce; however, this appears to be improving with time and reassurance."

(Plaintiff exhibit 16, p. 1.)

After this incident, plaintiff revised the paragraph to read:

"The labor relations at Plumb were strained somewhat due to the replacement of the Plant Manager; however, this appears to be improving throughout the workforce with time and reassurance."

(*Id.*, p. 2.) Hackett said nothing about the revision.

42. Also, while plaintiff was still the acting employee relations manager, a controversy arose over an applicant named Daniel Holland. Holland's application showed that he was a paraplegic. Plain-

tiff, however, invited Holland to the plant for interviews. Plaintiff, the shop foreman, and the tool and die superintendent interviewed Holland. They concluded that he could do the work safely despite his handicap. They intended to hire him. Hackett torpedoed the idea. He said, "We don't need that problem." Plaintiff felt that Hackett could be illegally discriminating against Holland, but after discussing the situation with a company official in Raleigh, she sent Holland a rejection letter. Plaintiff felt that she was being forced to do something that was against the law. This incident made her still more uncomfortable with Hackett and her position.

43. Plaintiff told Patti Broome, the personnel assistant, and Ed. Sherbert that she was having difficulty working with Hackett.

44. Hackett denied shunning plaintiff in any way. With regard to the report incident, he admitted "discussing" the report with the plaintiff outside the training building. He said he felt the first paragraph was not as "factual" as it should be. He claimed not to know whether the door of the class was open or not. He denied that he was visibly upset or that he was loud. He denied that he intended to embarrass plaintiff. With regard to the Daniel Holland incident, Hackett said he felt that Holland would not be safe. Based on his demeanor and evasiveness on the witness stand, the court does not believe Hackett on these points.

45. After Ed. Sherbert was hired, he too asked plaintiff to do something that she felt was illegal. Sherbert had a list drawn up of all the employees at Plumb with union backgrounds (*see* plaintiff exhibit 17). He then asked plaintiff why she had hired the people on the list. She said because they had been the most qualified. He told her that he had been sent there to "straighten this out" and that from this time forward she was to hire no one from a unionized state or plant or who was affiliated with a union. Plaintiff said that she could not do that because she thought it

was illegal. Sherbert then took hiring responsibilities away from her.

46. Patti Broome testified that plaintiff, before Sherbert was hired, ordered her to screen out applicants who were affiliated with unions.

Broome's testimony is not credible. She could not explain how, if she properly followed plaintiff's alleged directions, the employees on the list were hired. In addition, her fiancé, with whom she lives, is an employee of Plumb, and Plumb is a client of her present employer.

47. Before Ed. Sherbert was hired, plaintiff organized and attended the open forum meetings for employees. After Sherbert came, she was not invited to these meetings. She mentioned this to Sherbert, and he told her to go to one at 7 A.M. (she normally did not report to work that early). She went to that meeting but was not invited to any others.

48. Sherbert made plaintiff's job unnecessarily difficult in two ways. First, at the end of each month he would delegate to her the task of writing the monthly employee activity report. He would do this after having promised the prior month not to require her do it the next month. Since the report took from four to eight hours and since Sherbert waited until the last minute to tell her to do it, plaintiff was pressed to get the reports in on time. Plaintiff got the reports in on time, but it was a great strain on her.

Second, shortly after he came, Sherbert changed the interviewing procedures so that plaintiff could no longer interview applicants at the plant. Plaintiff had to interview them at the Employment Security building several miles away. Plaintiff had no office at that building and simply had to carry around her papers. When applicants were late or did not show up, she could not use the time for something else. This change in procedure made plaintiff's job much more difficult and caused her to work considerable overtime. Sherbert refused to change the system.

49. Sherbert told plaintiff that she had no future at Plumb. He said he would help her find work elsewhere. Because she was unhappy with the way Hackett was treating her, she gave Sherbert her resumé. Sherbert learned from a recruiter that a company in South Carolina was offering $33,000 a year for a female personnel manager. Plaintiff told Sherbert that she was not interested. Without her permission, Sherbert sent her resumé with a letter of recommendation to the recruiter.

50. As to the above events, Sherbert testified that he had seen union activity around the plant in the summer of 1983 (plaintiff said there was no such activity), and that he wanted the list of union people to monitor the situation; that he did not tell plaintiff not to hire persons from union states or plants or anyone with union affiliations and did not strip her of hiring authority. Sherbert also testified that he did not ask plaintiff to prepare the monthly reports; that when he did ask her for assistance, he gave her several days notice; and that he never told her that he would not ask her to work on the report in the future. Sherbert denied ever telling plaintiff to go to a 7 A.M. forum meeting. He said that plaintiff asked him to help her find a job, and that he urged her to stay with Plumb.

Based on his demeanor at trial, the court does not believe Sherbert as to these events.

51. The court finds that Sherbert took the above actions with intent to force plaintiff leave her job at Plumb. He wanted her to leave Plumb because the employee relations department was overstaffed and because, if she stayed, eventually she would have to be made an employee relations manager.

52. Despite his other actions, Sherbert, unlike Hackett, apparently had no malice toward plaintiff and had a high opinion of her ability. He rated her "commendable" in August, 1983.

53. Because plaintiff was rated "commendable" and her prior raise had been on November 1, 1982, she understood that she

should receive a merit pay increase on September 1 or October 1, 1983 (*see* plaintiff exhibit 8). She therefore prepared the proper forms and sent them to Sherbert who approved them and sent them on to Hackett. Plaintiff did this in mid-August because Hackett had recently instituted a new policy that pay increase requests had to be on his desk by the middle of the month before the effective date of the increase so that he could approve them by the effective date (*see, e.g.,* plaintiff exhibit 37, pp. 4–14, 16–18; plaintiff exhibit 47, p. 1; defendant exhibit 35).

54. The defendants attempted to show at trial that plaintiff was not eligible for the pay increase until October 1 or November 1, 1983. The time when plaintiff was due a raise depends on whether the company rounded off her salary mid-point calculation. Plaintiff's salary at the time was 79.9 percent of mid-point (*see* defendant exhibit 59). If the company rounded that off to eighty percent, plaintiff should not have gotten the raise until October 1 or November 1, 1983. If the company did not round off the mid-point calculation, she should have gotten the raise on September 1 or October 1, 1983 (*see* plaintiff exhibit 8).

Plaintiff, who was apparently the most knowledgeable on the subject, thought she was eligible September 1, 1983. Sherbert admitted on cross-examination that he probably would not have sent the forms to Hackett in August if plaintiff had not been eligible for a raise until October.

The court finds that the company's policy was not to round mid-point calculations off, and that plaintiff was eligible for the raise on September 1 or October 1, 1983.

55. Bert Hackett followed company guidelines in approving pay raises. At trial, he could name only one person, Dave Sedivi, to whom he had not given a raise during the proper period (*see* defendant exhibit 35).

56. Hackett in fact often approved of pay raises to take effect at the earliest possible date. Examples of this are Melvin Bull (plaintiff exhibit 47, p. 2), Ray Hellmer (plaintiff exhibit 47, p. 5), Joe LeQuick (plaintiff exhibit 36, p. 6), Scott Lobb (plaintiff exhibit 37, p. 6), Robert Sargent (plaintiff exhibit 37, p. 11), and Marc Pincus (plaintiff exhibit 20). Scott was rated "good plus." Bull, LeQuick, Lobb, and Helmer were rated "good." Pincus was rated "good minus!" None was rated "commendable." All were men.

57. Between mid-August, when plaintiff gave the forms to Sherbert, and mid-October, when she left Plumb, plaintiff spoke to Sherbert several times about the pay raise. Sherbert told her that Hackett would not consider it. He said he could not understand Hackett.

58. On October 14, 1983, plaintiff requested a meeting with Hackett and Sherbert. At the meeting she asked Hackett why he would not give her the raise that she was due. Hackett refused to discuss the issue or look at her papers. He said to discuss it would be to give her a review and that he was not going to give her a review.

Hackett also told plaintiff that the plant was too small for an assistant employee relations manager. Plaintiff then resigned.

59. Hackett's purported reason for not approving the raise in October, 1983, and at trial was that he objected to plaintiff's being rated "commendable." He claimed that Sherbert had not worked with plaintiff long enough to give her a "commendable" rating. He told the court that Sherbert would have had to have worked with her a year legitimately to give her a "commendable" rating.

60. The court finds that Hackett's reason is pure pretext. First, Hackett himself had rated Joe LeQuick "commendable" after Hackett had been at Plumb only three months (plaintiff exhibit 44). Second, plaintiff would have been eligible for the raise at the same time even if her rating had only been "good" (*see* plaintiff exhibit 8). And since Hackett did not have to approve of the rating in order to approve of the pay raise, there was no reason for Hackett to hold up plaintiff's raise just because he disagreed with the rating.

61. The court finds that Hackett shunned and humiliated plaintiff, ordered her to do potentially illegal things, and refused to consider her pay raise, in order to force her to resign. He wanted her to resign so that the employee relations department would no longer be overstaffed. (Sherbert testified that after plaintiff left, she was not replaced; her duties were simply divided up between him and Broome.) He also wanted her to resign because he knew that she wanted to be employee relations manager and thus that she would be a continuing problem with regard to that position.

62. The court finds as fact that the actions of Hackett and Sherbert created intolerable working conditions for plaintiff at Plumb.

Plaintiff was not unduly sensitive but instead was extraordinarily tough. Any other reasonable person would have found the working conditions imposed on plaintiff intolerable and would, like plaintiff, have felt compelled eventually to resign.

63. Because of the above described actions, plaintiff left Plumb and accepted a job with Kendall in Lumberton, North Carolina, on October 28, 1983. She moved with her child to Lumberton. She has lived and continues to live in Lumberton from Monday through Friday, returning to her home in Peachland on the weekends. When she started work in Lumberton, she lived in a motel room. She now has an apartment.

### C. *Damages*

64. Plaintiff suffered monetary loss as a result of defendants' refusal to promote her and their constructive discharge of her.

From April 1, 1983, by which time she should have become employee relations manager, through October 1983, she earned $1,800 a month for a total of $12,-600.00 (plaintiff exhibit 22).

From October 28, 1983, when she left Plumb, until September 1, 1985, plaintiff earned $69,300.00 at the Kendall Company (*id.*). In order to earn that sum and miti-

gate her damages, however, plaintiff was forced to establish a satellite household at Lumberton, N.C., in which to live during the week, and to commute from Peachland to the Kendall plant at Lumberton (120 miles) twice a week. Those extra expenses, October 28, 1983, through September 1, 1985, totaled $27,068.23 (plaintiff exhibits 24, 25). Plaintiff's net earnings, 10/28/83 to 9/1/85, were therefore only $42,231.77.

Ed. Sherbert is the proper person to compare with plaintiff in determining how much plaintiff would have earned had defendants not discriminated against her. Sherbert earned $94,395.00 from April 1, 1983, through September 1, 1985 (plaintiff exhibit 22). Since plaintiff's net earnings were only $42,231.77, she has therefore suffered monetary damages from April 1, 1983, through September 1, 1985, as a result of defendants' discrimination, of $52,-163.23.

65. Defendants contended at trial that company policy would have prevented plaintiff from receiving a pay raise of more than twenty percent in a year (*see* plaintiff exhibit 37, p. 3), and therefore that she would not have made as much as Sherbert even if she had gotten the job.

The court finds that this "policy," like the previous one limiting raises to twenty-five percent in a year, was not uniformly applied. For instance, Jack Summers was promoted from assistant employee relations manager to employee relations manager at defendants' Sumter, South Carolina, plant and received a raise of fifteen percent; that brought his raises for the year to 22½ percent (plaintiff exhibit 34). Greg Meyers, the industrial relations representative in Houston, and Joe LeQuick, the controller at Plumb, both received raises totaling more than 20% in one year (*see* plaintiff exhibit 35, pp. 1, 5; plaintiff exhibit 36).

Thus, plaintiff could have made the same salary that Ed. Sherbert made, and his salary is the appropriate salary to compare for back and front pay considerations.

## II

### CONCLUSIONS OF LAW

1. This court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e–5(f)(3).

2. Defendants are "employers" within the meaning of 42 U.S.C. § 2000e(b). Plaintiff is an "employee" within the meaning of 42 U.S.C. § 2000e(f).

3. All jurisdictional prerequisites have been met.

4. Plaintiff's claim must be examined in light of the guidelines set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See also United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Pursuant to those guidelines, plaintiff has the burden of showing by a preponderance of the evidence a *prima facie* case of discrimination. In order to establish a *prima facie* case, plaintiff must prove that she applied for a position for which she was qualified and was rejected, or that she was discharged (or constructively discharged) from a position in which her level of performance was acceptable, and that the rejection or discharge occurred under circumstances that give rise to an inference of unlawful discrimination. *Burdine, supra*, at 253, 101 S.Ct. at 1093. If plaintiff meets this burden, she establishes a rebuttable presumption that she was discriminated against. The burden then shifts to defendants to articulate some legitimate, non-discriminatory reason for rejecting or discharging her. 411 U.S. at 802, 93 S.Ct. at 1824.

If defendants carry their burden of producing evidence sufficient to raise a genuine issue of fact as to whether plaintiff was intentionally discriminated against, the inquiry rises to a new level of specificity. *Burdine, supra*, at 254–55, 101 S.Ct. at 1094–95. At this stage, plaintiff, who bears the burden of persuasion throughout the case, must be given the opportunity to demonstrate that the reason proffered by defendants for their employment decision was not the true reason for their actions. As the Supreme Court stated in *Burdine*, plaintiff may do this "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." 450 U.S. at 265, 101 S.Ct. at 1100. In other words, where both parties have met their respective initial burdens, the court must, while requiring plaintiff to meet the burden of persuasion, "decide which party's explanation of the employer's motivation it believes." *Aikens, supra*, at 715, 103 S.Ct. at 1482.

■ 5. Plaintiff has made a *prima facie* case that she was *denied a promotion* to the employee relations manager position on account of her sex. Her evidence shows that she applied for the employee relations manager position at Plumb; that she was qualified; but that she "was rejected under circumstances that give rise to an inference of unlawful discrimination." *Burdine, supra*.

■ 6. Plaintiff also has made a *prima facie* case that she was *constructively discharged* (forced to resign) on account of her sex.

7. Defendants "articulated" non-discriminatory reasons for failing to promote plaintiff. They said that she was not qualified, and that they had to make Ed. Sherbert the employee relations manager at Plumb or he would leave the company.

8. Defendants' proffered reasons for not promoting plaintiff to employee relations manager are pretextual and are not the real reasons. Plaintiff was more qualified than Edward Sherbert. Further, the employee relations manager position was open at other plants owned by the defendants, and they could have placed Sherbert in one of those positions. Plaintiff was denied the promotion because she was a woman.

9. Defendants also "articulated" non-discriminatory reasons why they did the

things which forced plaintiff to resign. For example, Hackett said he did not think Sherbert could legitimately rate plaintiff "commendable" after only three months.

10. The court concludes for the reasons set forth in the findings of facts that defendants' proffered reasons for the actions that forced plaintiff to resign are pretextual.

11. Plaintiff has shown that defendants forced her to leave by deliberately making her working conditions unbearable and intolerable. *Bristow v. The Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985). Plaintiff has shown that the conditions imposed on her were intolerable from the objective standpoint of a "reasonable person" in her position. *Id.*

12. Defendants violated 42 U.S.C. § 2000e–2(a) by discriminating against plaintiff on account of her sex when they refused to promote her to employee relations manager at the Plumb plant in Monroe, North Carolina, effective April 1, 1983, and when they constructively discharged her on October 14, 1983. Plaintiff is entitled to be made whole. *Albemarle Paper Company v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *White v. Carolina Paperboard Corp.*, 564 F.2d 1073 (4th Cir.1977).

14. In assessing the monetary damages that plaintiff is entitled to, the court must calculate "the economic consequences of hypothetical employment" as employee relations manager at Plumb and "compare it with the economic consequences of actual employment." *United Transportation Union Local No. 974, AFL–CIO v. Norfolk and Western Railway Company*, 532 F.2d 336, 341 (4th Cir.1975), *cert. denied* 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976).

■ The best indication of what the economic consequences of hypothetical employment would have been as employee relations manager at Plumb since April 1, 1983, is the earnings of Ed. Sherbert over that period. Those earnings are $94,395.00. The actual economic consequences

of plaintiff's employment since April 1, 1983, would normally have been her salary at Plumb through October ($12,600) plus her salary at Kendall since then ($69,300). However, in this case there were extraordinary expenses attributable to plaintiff's accepting the employment at Kendall, which she did in order to mitigate her damages. These extraordinary expenses are the costs of commuting and of setting up and maintaining a second household at Lumberton, North Carolina, where she has been forced to live during the week. These costs are not in the nature of consequential damages such as personal injuries or damage to a credit rating. They are "economic consequences." Therefore, in assessing the actual economic consequences of plaintiff's employment at Kendall, these expenses ($27,068.23) must be deducted from her salary there.

Through August 31, 1985, Plaintiff has suffered monetary damages totalling $52,163.23.

Plaintiff is entitled also to her monetary damages since August 31, 1985, and to job reinstatement, counsel fees, costs, moving expenses to return to Peachland, and prejudgment interest on all items. 42 U.S.C. § 2000e–5(g), (k).

Plaintiff will tender an appropriate judgment.

The original memorandum of decision filed December 31, 1985, contained several minor inaccuracies and stylistic aberrations which in no way affect the substance of the decision but which need to be corrected.

IT IS THEREFORE ORDERED that the original memorandum of decision is replaced by the attached corrected memorandum of decision, and that the original memorandum be prominently marked: "SUPERSEDED BY REVISED MEMORANDUM OF DECISION FILED JANUARY 29, 1986."