**Michael PROULX, Plaintiff,**

v.

**CITIBANK, N.A., Defendant
(Two Cases).**

No. 84 Civ. 8156, 85 Civ. 4348 (MBM).

United States District Court,
S.D. New York.

March 2, 1988.

As Amended March 11, 1988.

BLS Legal Services Corp., Federal Litigation Program, Brooklyn, N.Y. (Minna J. Kotkin, Helene Jaffa, Legal Intern, Monika Mazurczyk, Legal Intern, Dominique Penson, Legal Intern, Concettina Sacheli, Legal Intern, of counsel), for plaintiff.

Proskauer, Rose, Goetz & Mendelsohn, New York City (Bettina B. Plevan, Andrew Marks, of counsel), for Citibank.

## MEMORANDUM OPINION
## AND ORDER

MUKASEY, District Judge.

On October 26, 1982, Michael Proulx, an employee of Citibank, N.A., filed a complaint with the New York State Division of Human Rights ("DHR") charging Citibank, through the acts of Proulx's supervisor, Robert Ganey, with sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* After that agency failed to sustain his claim and the Equal Employment Opportunity Commission adopted that conclusion as its own, he sued in this Court. Notwithstanding an assumption *arguendo* that his DHR complaint was not merely frivolous but

also malicious, he was awarded a summary judgment on the ground that his DHR complaint provided part of the basis for his dismissal. 659 F.Supp. 972, 977 (S.D.N.Y. 1987).

Thereafter, this case was reassigned to me for trial on damages.

## I.

Proulx first worked at Citibank from October 1980 until around October 1981 while in the employ of a company that placed him there temporarily. He worked in what was known as the CBC Unit, answering telephone calls for assistance from cash machine patrons. He asked to be hired as a permanent employee in that unit but was refused, and resigned to take another job. Thereafter, at the behest of Robert Ganey, for whom he had done some work during his initial stint at Citibank, Proulx returned to Citibank in May 1982, again in the employ of an outside temporary employee placement company. This time he worked for Ganey helping to establish a record retrieval system in what plaintiff has described as a warehousing job. On July 14, 1982, he was hired directly by Citibank as a temporary employee, although he has testified he believed that after a six-month period he would be hired in a permanent capacity.

Shortly after Proulx filed the sexual harassment charge with the DHR, he wrote a memo to one of Ganey's superiors at Citibank demanding that he (Proulx) and Ganey have "no verbal contact."

Citibank executives, reacting in apparent good faith to the anomaly of an employee who would have "no verbal contact" with the person who was supposed to act as his immediate supervisor, proposed to change Proulx's job location and duties, but not his salary. Proulx testified that the proffered job involved no more than sitting at a desk sorting papers, but that he promised to consider it, and did consider it over a period of about a week or ten days before he turned it down. During that period, he claimed, Viola Clark, a Citibank supervisor, threatened him and told him the bank could force him to take the new job.

By contrast, the supervisor who offered the new job, Alfred Spitzer, testified that the job involved research into the creditworthiness of customers, including telephone calls, writing of letters and use of a computer. This testimony, which I credit, showed that the job involved the use of skills and initiative at least fully comparable to those required in Proulx's then current job. Inasmuch as the salary was identical, the two jobs were certainly comparable. In addition, Spitzer testified that rather than promising to consider the proffered position, Proulx rejected it immediately. Again, I credit that testimony not only because of Spitzer's credible demeanor but also because there would have been little sense and even less to be gained by threatening Proulx, as he claims he was threatened by Ms. Clark, if in fact Proulx had promised to consider the new job rather than rejecting it immediately.

On November 24, 1982 Proulx was fired. He testified that he then began looking for a warehousing job because he felt that was what he was best suited and trained for, although of the ten years he was employed following his discharge from the Marine Corps in 1972 until his termination from Citibank in 1982, one and one-half years *at most* was spent in jobs he would categorize as warehousing, and he had sought permanent employment in the CBC unit at Citibank which did not involve warehousing. Although he testified on the one hand that he was looking for a warehousing job, he also swore that he "would have taken anything. I mean, that includes sweeping the street if necessary...." (Tr. 41) He estimated that he had made "a couple thousand [visits to potential employers], 2500, 3000. I mean, I felt it was quite often,"[1] (Tr. 126) plus telephone calls at the rate of between two and four a week between his discharge from Citibank in November 1982 and his employment in a warehousing job at Philip Morris in September 1985. Despite this effort, plaintiff found no employ-

---

1. Proulx's counsel suggested in summation that this testimony was to be taken simply as a symbol for a number of visits that seemed like thousands to Proulx. (Tr. 348).

ment until "about mid–'83." (Tr. 52) Inasmuch as he collected unemployment insurance for the 26 weeks following his discharge from Citibank (Tr. 67), and testified that he worked at the job he found in "mid–'83" for "the majority of that year," (Tr. 103) this would mean his job search bore fruit providentially at or shortly after the time his unemployment insurance ran out. (Twenty-six weeks is the maximum period of such benefits. N.Y.Labor Law ¶ 590(4) (McKinney Supp.1988); Explanatory Guide to New York Unemployment Insurance Law, Unempl.Ins.Rep. (CCH) ¶ 1935 (March 20, 1984)).[2]

He worked nights at two restaurants from mid–1983 until September 1984, and then was unemployed, according to his testimony, until the spring of 1985, when he worked briefly, and then again until September 1985, when he was employed by Philip Morris as a temporary employee and later as a permanent employee.

## II.

Proulx has claimed he is entitled to back pay from the date of his termination through December 2, 1985, undiminished either by unemployment benefits or by the proceeds of casual or "moonlighting" employment.

Citibank argued that Proulx's damages were nil or minimal for four reasons: First, because Citibank offered him a job comparable to the one from which he was fired, and Proulx declined it, his failure to mitigate damages bars recovery under *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 224, 102 S.Ct. 3057, 3061, 73 L.Ed.2d 721 (1982). Second, Proulx was frequently late for work and was warned by both Ganey and another supervisor about his lateness, and also admittedly lied about his work record on his application for employment; under established Citibank policies, he was therefore a candidate for imminent dismissal. Third, Citibank argues that Proulx's own work history, reflecting intermittent employment and long periods of idleness, sug-

gests he would have switched jobs in any event, particularly if Citibank failed to change his status from temporary to permanent employee. Finally, Citibank argues that Proulx's attempts to find employment were so desultory as to constitute a failure to mitigate damages.

## III.

Although the first three claims do not withstand scrutiny, the evidence at trial supports the fourth for the reasons explained below.

### 1. *The Alternative Job Offer*

■ It was plain from the evidence at trial, and I find, that the alternative job offered to Proulx was at least substantially equivalent to the job from which he was fired. Accordingly, there is no doubt that if Proulx had been offered that job as an alternative to termination, or after termination, his damages would have ceased to run from the time it was offered. That result follows from what the Supreme Court wrote in *Ford Motor Co. v. E.E.O.C.*, *supra:*

> An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in § 706(g). This duty, rooted in an ancient principle of law, required the claimant to use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied. 458 U.S. at 231–32, 102 S.Ct. at 3065–66 (footnotes omitted).

However, both Proulx and Citibank's Alfred Spitzer, the supervisor who offered the alternative job, agreed that Proulx was not offered that job as an alternative to termination, but only as an alternative to the job he held before he was fired. In fact, Spitzer was candidly doubtful as to

---

**2.** Proulx's employment pattern in 1983 must be determined almost entirely from his current testimony; he filed no tax return for that year.

whether that alternative job would have been open to Proulx had he asked for it when he was fired. Spitzer testified the issue never arose because, as I found above, Proulx turned the offer down as soon as it was made. Because Proulx did not become the victim of discrimination barred by Title VII until he was fired, his obligation to mitigate damages cannot have arisen before then. Because the alternative job was offered only before Proulx was fired, his failure to accept it could not have been a failure to mitigate damages.

### 2. *Imminent Termination*

■ Alternatively, Citibank argues that Proulx would have been fired for non-discriminatory reasons—his late and erratic attendance, and his falsification of his employment application. Therefore, Citibank argues, he should receive minimal damages, if any. *Cf., Bonura v. Chase Manhattan Bank, N.A.*, 629 F.Supp. 353, 356 (S.D.N.Y.1986), *aff'd*, 795 F.2d 276 (2d Cir. 1986). Here the burden of going forward was on Citibank, although the plaintiff retained the burden of persuasion. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253–59, 101 S.Ct. 1089, 1093– 97, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Wherever the burden rested, however, the record simply will not sustain the argument advanced by Citibank. Although Proulx's own testimony established that he had been warned twice about his lateness, one of those warnings came from Ganey, the supervisor whose difficulty with Proulx seems to have generated Proulx's complaint to DHR.[3] Nor was there any evidence that Proulx's admitted falsification of his work record on his application for employment was about to be detected, particularly in view of his unrebutted testimony that it was accomplished with Ganey's connivance. Finally, a written evaluation

of Proulx by his Citibank supervisors, including Ganey, dated October 4, 1982, was highly favorable. Thus, the record before me failed to establish either that Proulx would have been terminated or, if so, when. As both sides seemed to agree, neither an award of damages, *Darnell v. Jasper*, 730 F.2d 653, 656 (11th Cir.1984), nor denial of them, *Kolb v. Goldring, Inc.*, 694 F.2d 869, 872 (1st Cir.1982), may be based on speculation.

### 3. *Voluntary Termination*

Nor can I find on this record that Proulx would have left the employ of Citibank voluntarily or, if so, when. It is true that his employment history since his discharge from the Marines was marked by frequent job changes and long periods of unemployment. From 1972 to 1979 he held eight different jobs in four states and spent at least eight months without employment; he held no job during that period for longer than a year. However, that provides no basis for determining that he would have left Citibank at any particular time.

### 4. *Mitigation of Damages*

■ However, although the record does not support a finding that Proulx would have been fired from Citibank or left voluntarily, that does not automatically entitle him to an award of damages at the rate he would have earned at Citibank until he earned what he considered appropriate at Philip Morris, less only what he earned in the interim. He was obligated to act reasonably to mitigate his damages. *Ford Motor Co. v. E.E.O.C., supra*, 458 U.S. at 231 n. 15, 102 S.Ct. at 3065 n. 15. The burden of showing he did not rested with Citibank, and that burden involved showing not merely that alternatives were available but that the plaintiff was unreasonable in not exploiting them successfully. *E.E.O.C. v. Kallir, Philips, Ross, Inc.*, 420 F.Supp. 919, 925 (S.D.N.Y.1976) (Weinfeld, J.),

---

**3.** Citibank tried to introduce as business records certain time logs kept by Ganey that allegedly showed Proulx was often late. Notably, Ganey, although still employed by Citibank at the time of trial, was not called to authenticate them. In view of Ganey's substantial motive to falsify the

records, his dual role as their creator and custodian, his availability to testify and his failure to appear, I excluded the records even at this bench trial. *See*, 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(6)[07] (1987).

*aff'd,* 559 F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). That burden is substantial, but Proulx's own testimony helped substantially to meet it.

Proulx's account of his job search (see pp. 201–202 *supra* ) suggests he made approximately 20 personal visits and two to four telephone calls per week to potential employers from November 1982 to September 1985. These efforts, he testified, included repeated contact with two agencies in New York, specializing in temporary job placement, even though they failed to refer him to any jobs. He testified that he avoided agencies that charged a fee "in advance" because he lacked the funds. But testimony from a witness with experience in the operation of employment agencies showed that although an agency fee might have been as high as 25% of a month's salary, depending upon the skill level of the job in which the applicant was placed, the customary deposit was $50.00, and that was frequently waived when applicants could not afford it. The fee itself was collected only from the salary when paid.

Proulx claimed he responded to newspaper advertisements but could not recall the name of any employer or agency he contacted through such an advertisement. He kept no records of his job search. Indeed, although he kept and introduced what he said were accurate records of his hours while he was employed at Citibank— records that would seem to have been superfluous in view of the records Citibank itself kept—he maintained no record of the hours he worked in casual employment after he left Citibank, when such records would have been useful.

■ Proulx explained that the focus of his job search after he was fired from Citibank was warehousing because that was what he was "suited" for, although as noted above only one and one-half of the ten years following his military service, until he was fired by Citibank, had been spent in jobs he described as warehousing. In fact, during his initial stint at Citibank, he sought and was denied permanent employment in a job that did not involve ware-

housing. But even if one credits his testimony on this point and acknowledges that warehousing was a legitimate focus of his search, evidence introduced by Citibank showed that warehousing jobs at salaries comparable to what Proulx earned at Citibank were available and advertised in abundance during the period Proulx remained unemployed or employed at other jobs that paid less. His answer when asked if he saw advertisements for employment agencies that dealt in warehouse work was as follows: "No, not too many, none. I can't recall." (Tr. 50–51)

Moreover, the evidence relating to Proulx's job search was not introduced in a vacuum. It must be weighed along with other evidence relating to Proulx's credibility, including what I have found to be his untruthful account of the alternative job offer by Citibank and his admitted falsification of his employment application at Citibank. That evidence, along with Proulx's curious record-keeping and lack of it, his allegedly energetic job search efforts that managed to concentrate and persist solely in unproductive inquiries while apparently avoiding more productive and readily available alternatives such as employment agencies, and particularly the fortuity that he managed to find a job just as his unemployment benefits ran out, coupled with his articulate and otherwise presentable demeanor which reflected no psychological or other limitation that should have impeded a reasonable job search, lead me to conclude that Proulx's job search efforts as he described them were neither objectively reasonable nor subjectively the limit of his abilities. Accordingly, I find that Citibank has met its burden of showing that Proulx failed to mitigate damages.

Evidence of the extent of Proulx's failure to mitigate damages may be found in the length of time between the expiration of his unemployment insurance benefits and the time he first became employed after he was fired by Citibank, that being the period in which his unemployment arguably was not the result of his choice or his fault. Proulx was fired November 24, 1982; he would not have become eligible for unem-

ployment benefits until the following week at the earliest, N.Y.Labor Law § 521 (McKinney 1977), and as noted above, his unemployment benefits expired 26 weeks later on May 30, 1983. He testified that he worked for most of 1983 in a restaurant, which would mean that he worked there for at least part of June 1983. Even giving Proulx the benefit of all the *arguendos*, *E.E.O.C. v. Enterprise Ass'n. Steamfitters*, 542 F.2d 579, 587 (2d Cir.1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977), and mindful that "unrealistic exactitude" is not required in this computation, *ibid.*, the longest period in which it is reasonable to believe Proulx was unemployed involuntarily was three weeks. I find that Proulx's success in locating a job not later than three weeks after his unemployment benefits ran out is the most reliable guide available in this record to how quickly he should have located a job after he was fired from Citibank. Proulx's weekly salary at Citibank was $222.60. I do not find it reasonable to add to that the cost to Citibank of fringe benefits such as health insurance when Proulx has not claimed he had need of such benefits during the period in question. *Kossman v. Calumet County*, 800 F.2d 697, 703 (7th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1294, 94 L.Ed.2d 151 (1987); *Bonura v. Chase Manhattan Bank, N.A.*, 629 F.Supp. 353, 359 (S.D.N.Y.1986).

During two of these three weeks of presumptively involuntary unemployment Proulx received $107.70 per week in unemployment benefits which, when subtracted from $222.60 yields $114.90 per week for two weeks, or $229.80; that sum added to one week at $222.60 yields $452.40. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 47 (2d Cir.1980) (reduction for unemployment insurance benefits was appropriate).

■ I have found that Proulx acted unreasonably in not pursuing alternative employment that was available *inter alia* through employment agencies. That was the thrust of Citibank's proof. It seems reasonable, therefore, to consider whether Proulx should be awarded the fee he might have had to pay to an employment agency had he pursued the course that Citibank argues it was unreasonable for him not to pursue. Although I have found no authority on precisely this point, it is clear that the central purpose of Title VII is to make persons whole for the injury they have suffered, and that courts' discretion to fashion relief should match the breadth of the facts before them. *Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 764–65, 96 S.Ct. 1251, 1264–65, 47 L.Ed.2d 444 (1976). That being so, it is not surprising that there is precedent for an award of damages to compensate for expenses incidental to hypothetical employment. *Thomas v. Cooper Industries, Inc.*, 627 F.Supp. 655, 668 (W.D.N.C.1986). Accordingly, to the sum of $452.40 should be added the fee Proulx would have had to pay to an employment agency had he secured work through such an agency. Again giving him the benefit of doubts relating to whether he would have used such an agency and, if so, whether his job would have been classified at a skilled level requiring a higher fee, Proulx would have had to pay 25% of one month's salary as a fee. A salary of $222.60 per week (his salary at Citibank) amounts to $964.60 per month, 25% of which is $241.15; when that is the added to the damages computed above, the total is $693.55.

■ Although it is ordinarily an abuse of discretion not to award pre-judgment interest in a Title VII case, *E.E.O.C. v. County of Erie*, 751 F.2d 79, 81 (2d Cir.1984), this is hardly an ordinary case, at least in its present posture. The occasion for the plaintiff's dismissal has been assumed *arguendo* to have been his own malicious conduct; the plaintiff has received the benefit of more than one doubt in computing his damages; the plaintiff's testimony has been found substantially wanting in credibility on several key points. In these circumstances, notwithstanding that Citibank assuredly has more money than the plaintiff and the plaintiff is being compensated for sums denied him in 1982, I believe the more reasonable exercise of discretion in this case is to deny pre-judgment interest.

Therefore, the plaintiff will recover of the defendant $693.55, and the Clerk will enter judgment accordingly.

The foregoing shall constitute my findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

SO ORDERED.