Patricia **MILLIGAN–JENSEN**, Plaintiff,

v.

**MICHIGAN TECHNOLOGICAL UNIVERSITY, a Michigan Public Body**, Defendant.

No. 2:89–CV–287.

United States District Court, W.D. Michigan, N.D.

July 12, 1991.

Timothy F. Cain, Bridges & Houton, Negaunee, Mich., for plaintiff.

Robert M. Vercruysse, Kurtis T. Wilder, Butzel, Long, Gust, Klein & Vanzile, Detroit, Mich., for defendant.

## OPINION

HILLMAN, Senior District Judge.

Plaintiff Patricia Milligan–Jensen was dismissed from employment as a public safety officer of defendant Michigan Technological University on February 25, 1988. She subsequently filed a lawsuit alleging sex discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and violations of Michigan state laws.[1] On March 12 through March 15, 1991, the Title VII sexual discrimination and retaliation claim was tried before the court without a jury.

At trial, plaintiff asserted that defendant discriminated against her on three separate occasions: (1) when defendant failed to hire plaintiff for a supervisory position in the summer of 1987; (2) when she worked as a public safety officer from November 1987 to February 1988; and (3) when defendant fired her after plaintiff complained to the Equal Employment Opportunity Commission in February 1988.

For the following reasons, the court finds that plaintiff's first claim, alleging discrimination in the hiring for the supervisory position, is without merit. However, the court finds there was direct evidence of sexual discrimination against plaintiff when she was a public safety officer. This

---

[1]. On September 5, 1990, the court granted defendant's motion to dismiss plaintiff's state law claims on the ground that defendant is entitled to Eleventh Amendment immunity. *See* Opinion and Order of September 5, 1990. On February 22, 1991 the court granted defendant's summary judgment motion on the ADEA claim. *See* Opinion and Order of February 22, 1991. Therefore, the Title VII count is the only remaining claim in plaintiff's first amended complaint.

discrimination, as well as plaintiff's complaint regarding her discriminatory working conditions, infected defendant's decision to fire plaintiff. Thus, defendant's decision to terminate plaintiff was discriminatory. Defendant failed to carry its burden of persuading the court that it would have fired plaintiff regardless of its sexual discrimination and retaliation.

Having considered the testimony of the witnesses, the documents in evidence, the depositions entered into evidence, the stipulations of the parties, and the pleadings, the court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. *Findings of Fact*

1. On July 20, 1987, plaintiff Patricia Milligan–Jensen applied for employment as a public safety officer ("PSO") with defendant Michigan Technological University, a public university located in Houghton, Michigan. Pl.Exh. 1. The entry qualifications for PSO were a high school diploma or its equivalent, one to three years of police and/or safety experience, and basic police school certification. Pl.Exh. 10.

2. On her employment application, plaintiff declared that she had a high school diploma and had served as a police officer for eight years with the Biloxi, Mississippi police department. Pl.Exh. 1. Because plaintiff was certified as a police officer in Mississippi, she could become certified in Michigan by obtaining a job in law enforcement and applying for recertification. Pl. Exh. 11. Plaintiff was qualified for the PSO position.

3. On the application, one question inquired, "Have you ever been suspended or fired from any position? If yes, give particulars." Pl.Exh. 1. Plaintiff checked the box marked "Yes" and in her explanation, plaintiff wrote, "Took unmarked car out of city limits—lack of communication." *Id.* When asked on the application the "reason for leaving" her position with the Biloxi Police Department, plaintiff wrote, "Political disatisfaction [sic]." *Id.* Another question on the application queried, "Have you ever been convicted of an offense greater than a minor traffic violation?" Plaintiff checked the box marked "No." *Id.*

On the last page, the application had a "statement" above plaintiff's signature. The statement said in part, "I hereby represent that each answer is truthful and constitutes a full and complete disclosure of my knowledge with respect to the question and I understand that my misrepresentation of facts shall constitute cause for dismissal regardless of when discovered by the university." *Id.*

4. When plaintiff hand-delivered her application for PSO to defendant's offices on July 20, 1987, she spoke to John Cunningham ("Cunningham"), who was at that time defendant's facilities security supervisor. Cunningham welcomed plaintiff's application, telling plaintiff that the department would be receptive to her application because "their woman" had just quit and "they had to hire a female." Tr. at 22.

5. On August 15, 1987, an advertisement for the positions of facilities security supervisor and facilities security officer with defendant appeared in the *Daily Mining Gazette.* Pl.Exh. 2. Both positions demanded essentially the same qualifications as those required for the position of PSO: a high school diploma or its equivalent, three years related experience, and basic police school certification. As plaintiff was qualified for the PSO position, she was also qualified for the positions of facilities security officer and supervisor.

6. On August 13, 1987, plaintiff wrote a letter to defendant's employee relations office requesting that her application be updated to include the position of "Facilities Security Officer." Pl.Exh. 3.

7. On August 27, 1987, Cunningham sent plaintiff information about the procedures for obtaining police certification in Michigan. Pl.Exh. 6. In the cover letter, Cunningham wrote, "We are interested in interviewing female applicants for the position of Public Safety Officer." *Id.*

8. In early September 1987, plaintiff was interviewed for the facilities security supervisor position by William Eilola ("Eilola"), defendant's budget director. The reason

that plaintiff was interviewed for the supervisor position when she had requested the officer position was never clarified. In the interview, plaintiff and Eilola discussed plaintiff's prior suspensions in her Biloxi job.

Plaintiff left the interview with the impression that the job was hers as soon as she obtained her Michigan certification. However, plaintiff was mistaken. On September 9, 1987, Eilola wrote plaintiff that she was not selected as facilities security supervisor. Pl.Exh. 7.

9. Jon Ahola ("Ahola") was selected as facilities security supervisor. Ahola had previously served as the chief of police of the city of Hancock. In that position, he had worked with state and local police agencies located in Michigan's Upper Peninsula. Most important to the decision, Ahola had managerial experience which plaintiff did not possess. Ahola was more qualified for the supervisor position than plaintiff.

10. Plaintiff contacted defendant's offices when she learned that she was not selected as facilities security supervisor. Tr. at 45–56. Plaintiff spoke with Cunningham who assured her that, despite being rejected for the supervisor job, she could have the PSO position as soon as she obtained the Michigan certification requisites. Tr. at 45–57. Based on this assurance, plaintiff proceeded with her application for certification. Tr. at 47. On or about October 29, 1987, plaintiff received a letter from the Michigan Department of State Police informing her that her training had been waived because of her Mississippi certification. Def. Exh. 1c.

11. On November 7, 1987, plaintiff reported to Sergeant Louis Fredianelli ("Fredianelli") to begin working as a public safety officer. As director of public safety for defendant, Fredianelli was to be plaintiff's immediate supervisor. Plaintiff received a description of the PSO job when she began working. Tr. at 53. The job description lists "Characteristic Duties and Responsibilities." The first duty listed is to "[m]aintain safety, security and traffic programs through patrol, inspection, investigation,

assistance and transportation." Pl.Exh. 10.

12. In November 1987, plaintiff was the only female PSO working for defendant. Tr. at 56.

13. When she reported for work, plaintiff was issued badge number 33. Tr. at 56, 220. Each female officer who had previously worked for defendant's Public Safety Department had been assigned badge number 37. Tr. at 220–21. Approximately one month after plaintiff's arrival, Fredianelli asked plaintiff to turn in badge 33. Tr. at 56–57, 220. Fredianelli then issued badge 33 to male PSO Chris Crouch ("Crouch") and assigned plaintiff badge number 37. Tr. at 220. The reason for switching badges, Fredianelli testified, was because he was getting plaintiff and Crouch "mixed up." *Id.* When attempting to radio the female officer (plaintiff), Fredianelli would call badge 37. However, he would reach the male officer (Crouch). *Id.* To avoid confusion, Fredianelli decided to switch their badge numbers. *Id.*

14. Plaintiff was placed on the "bump shift," which was assigned to the officer with the least seniority. Tr. at 57, 277. The primary duties of the officer who worked this shift were to issue tickets for overdue parking meters and to relieve the dispatcher for lunch. Tr. at 57, 166–67. According to plaintiff, Fredianelli told her that she had more seniority than Crouch, who was hired as a "temporary employee" four months before plaintiff was hired. Tr. at 61–62, 164–65.

15. The other officers worked "swing shifts." Tr. at 60. Officers on the swing shift worked out of patrol cars and would respond to incidents that called for a public safety officer. Tr. at 60. Plaintiff characterized her job as a "meter maid" while Crouch and her male counterparts were "police officers." Tr. at 60.

16. Plaintiff and Crouch were working as PSOs at a hockey game on December 5, 1987. Neither was wearing the hat that they were supposed to don at such events. Tr. at 222. This was reported to Fredianelli, who on December 8 sent plaintiff a memo rebuking her for failure to wear a

hat. Pl.Exh. 14. Fredianelli also reprimanded Officer Crouch for failure to wear his hat. "I've told you verbally many times about wearing your hat," Fredianelli wrote to Crouch, "& you haven't paid attention to these warnings." Pl.Exh. 15.

17. On December 11, 1987, plaintiff received a 30–day "progress report." Pl. Exh. 17; Tr. at 226–27. The report contained eight categories: knowledge of job; ability to grasp and follow instructions; quality of work; quantity of work; attitude; attendance; work habits; and employee progress to date. Each of these categories could be checked either satisfactory, marginal, or unsatisfactory.

Fredianelli graded plaintiff "marginal" in all of the categories except attitude and attendance, for which plaintiff received "satisfactory" ratings. Plaintiff received no "unsatisfactory" ratings. *Id.* As the supervisor completing the report, Fredianelli was instructed to "answer all questions. An 'unsatisfactory' or 'marginal' rating must be supported with factual comments in the space below." Pl.Exh. 17. Fredianelli understood that he was supposed to apprise the employee of deficiencies in her work. Tr. at 226.

In the space for "additional comments," Fredianelli wrote, "The marginal items were discussed with Pat and she understood them. Example (Not having her police cap on her head, while working a MTU hockey game. (For work habit). [sic]" Fredianelli also reported that plaintiff was not absent or tardy during her first month.

18. When Fredianelli discussed the 30–day report with plaintiff, he was guided by notes prepared by his secretary, Barbara Ruotsala. Tr. at 228; Def.Exh. 1h. According to those notes and testimony at trial, Fredianelli criticized plaintiff for problems with her uniform. For example, Fredianelli told plaintiff that she was not wearing her tie tack properly. It was a man's tie tack, and when worn on a woman's shirt, it would be worn upside down. Tr. at 64–65. Fredianelli told plaintiff that her patrol reports should be neater and that she had to make sure a certain bank deposit bag was picked up. Fredianelli

also told plaintiff that she was spending too much time in the office and not out issuing tickets. Tr. at 286–88. Finally, Fredianelli told plaintiff that the tickets she issued were not always filled out correctly and some had to be voided. Tr. at 168.

19. On December 18, 1987, Officer Crouch was promoted to full-time PSO. Pl.Exh. 16; Tr. at 224–25. Fredianelli completed Crouch's 30–day evaluation on January 25, 1988. Pl.Exh. 18. Fredianelli rated Crouch "satisfactory" on all eight of the evaluation categories. *Id.* Fredianelli failed to mention that Crouch had not worn his hat at hockey games or that Crouch had failed to heed Fredianelli's many warnings about wearing his hat.

20. During Christmas break, 1987, plaintiff filled in for an officer on vacation and had difficulty locking doors to campus buildings. Tr. at 77–82. On two occasions, she locked doors that were supposed to remain unlocked. *Id.*

21. Plaintiff could not be certified in the state of Michigan until her employer verified that she was employed in law enforcement. Tr. at 34–37. On December 21, 1987, the Department of State Police sent Fredianelli a letter stating that plaintiff was certifiable. Pl.Exh. 11. At that point, all that was needed for plaintiff to be certified was verification from Fredianelli that plaintiff was working for defendant. Pl. Exh. 11.

In order to complete the verification process, Fredianelli asked plaintiff for her Michigan driver's license. Tr. at 68. On or about January 8, 1988, plaintiff gave Fredianelli her driver's license. Tr. at 72; Pl. Exh. 20. At that point, Fredianelli simply had to send in the verification. In fact, Fredianelli subsequently informed plaintiff that he had sent in the paperwork. Tr. at 113, 235. However, he never did so. Fredianelli testified that on or about January 8, 1988, when he deliberately failed to send in the papers for plaintiff's certification, he knew that plaintiff was going to be terminated. Tr. at 236–37.

22. On January 22, 1988, Fredianelli contacted the Biloxi police department in order to check on plaintiff's record there. Pl.

Exh. 21; Tr. at 241. At trial, Fredianelli could not recall ever checking into another public safety officer's past after he or she had been employed by defendant. Tr. at 244.

23. Plaintiff received her 60–day progress report on January 27, 1988. Pl.Exh. 22. Fredianelli gave plaintiff the exact same ratings as he had on her 30–day report: "satisfactory" in attitude and attendance, and marginal in the six other categories. *Id.* In the space for "additional comments," where Fredianelli was supposed to explain any marginal ratings, Fredianelli wrote, "Pending next 30 day probation we Jon Ahola and I recommed [sic] employee be retained. Must improve in marginal areas." *Id.* The notes prepared by Fredianelli's secretary for the evaluation stated that plaintiff wrote good reports and had good relations with people. Def.Exh. 1h; *see also* Tr. at 83.

24. In early February 1988, PSO Frank Suino announced his retirement. On February 11, 1988, plaintiff asked Fredianelli if she could be moved off the bump shift when Suino retired. Tr. at 90, 247. Fredianelli became angry and asked plaintiff what was wrong with the job that she had. Tr. at 90, 247, 252. Fredianelli then declared, "You're the woman, aren't you?" When plaintiff answered affirmatively, Fredianelli uttered, "You've got the lady's job. Don't you like it?" Tr. at 90, 247.

Plaintiff countered that she thought the days of blatant sexism were over. Tr. at 252. Fredianelli told the court that he was not sure what plaintiff meant by that. *Id.*

Fredianelli testified that he was "mad and upset" at plaintiff, who should not have "even been able to ask for [the swing shift] position," because she had a "good job." Tr. at 252, 294.

25. Immediately after Fredianelli's outburst, plaintiff called the Equal Employment Opportunity Commission ("EEOC") to complain. Tr. at 91–92. Fredianelli knew at the time that plaintiff had called the EEOC. Tr. at 261.

26. On the same day that Fredianelli made the statements recounted above, he wrote two notes to be placed in plaintiff's personnel file. Tr. at 252–55. The first note stated verbatim, "Pat [plaintiff] ask why she has dayshift job She was last one hired Nov, Chris was hired in May Seniority. I said its Female's job. Louis 2–11–88." Pl.Exh. 24. The second note, written on that same day, concerned plaintiff's performance as a PSO, "Rod Had to tell Pat to go out and check lots had complaint in Lot # 3 She spends to much time in the office 2–11–88 LF." Pl.Exh. 25.

27. On February 12, Fredianelli called the Biloxi Police Department to again inquire about information relating to plaintiff's work there. Def.Exh. 1v.

28. On February 13, plaintiff mailed the EEOC a complaint against defendant for sex and age discrimination. Pl.Exh. 26.

29. On February 15, plaintiff went to see Mary Laub ("Laub"), defendant's affirmative action officer. Pl.Exh. 30. Laub was trained as a geologist and had a business degree. She had no affirmative action experience before she became the school's affirmative action officer. Laub conducted a short investigation, talking to Fredianelli and other officers. On February 23, 1988, Laub concluded that Fredianelli's "You've got the lady's job" comment was an isolated act and no discrimination had occurred. Pl.Exh. 30. Laub orally reported those findings to Patricia Vitton ("Vitton"), director of defendant's employee relations office. Tr. at 99, 102.

30. Two weeks following Fredianelli's "lady's job" remark and plaintiff's telephone call to the EEOC, plaintiff had a meeting with Fredianelli and Vitton. They informed plaintiff that she was being terminated. Plaintiff asked why. Vitton stated, "You didn't complete your progress reports to satisfaction." Tr. at 107. At the same moment, Fredianelli stated that plaintiff spent too much time in the office. Tr. at 108. At no time during this meeting did either Fredianelli or Vitton bring up anything about plaintiff's application for employment with defendant or anything concerning her employment with the Biloxi Police Department.

The decision to terminate plaintiff was made by Fredianelli. Tr. at 262.

At the February 25 meeting, Fredianelli briefly discussed plaintiff's 90–day evaluation with her. Pl.Exh. 31. Plaintiff received the same ratings as she received in her 30– and 60–day evaluations: six marginals and two satisfactories. *Id.* Thus, plaintiff never received an "unsatisfactory" rating in the time she worked for defendant. On the back of the 90–day evaluation, Fredianelli wrote, "Employee did not successfully complete probationary period." *Id.*

31. When she was terminated, plaintiff believed she was certified to be a law enforcement officer in Michigan. Tr. at 113. Plaintiff was not aware that Fredianelli had never sent in the required papers to complete the certification process. *Id.*

32. After plaintiff's termination, Fredianelli started a file regarding contacts by other police agencies who were conducting preemployment inquiries about plaintiff. Tr. at 266. The file reveals that Fredianelli was contacted by at least two police agencies. Pl.Exh. 37. One sheriff asked Fredianelli if plaintiff was certified. Fredianelli informed him that plaintiff was never certified because she failed to procure a Michigan drivers' license. *Id.* Fredianelli testified at trial that at the time he gave that information to the sheriff, he knew it was untrue. Tr. at 267.

33. Plaintiff earned $31,121.59 in mitigation of damages from the date she was fired until the trial. Joint Exh. B.

34. In preparation for this trial, defendant learned that plaintiff had pled guilty to driving under the influence of alcohol on June 23, 1982. Thus, plaintiff had made a material falsification when she failed to reveal on her employment application that she had been convicted of an offense greater than a minor traffic violation.

35. After plaintiff was terminated, defendant hired Richard Olson, who declared on his application that he had been convicted of impaired driving in 1982. Tr. at 272. Fredianelli stated at trial that a conviction for drunk driving would not disqualify an applicant for the position of PSO. *Id.* Defendant would have hired plaintiff for the position of PSO even had she revealed her driving under the influence conviction.

36. Defendant had dismissed others for falsifying their applications. Defendant would have dismissed plaintiff when it discovered that she falsified the question on the application concerning prior convictions.

## II. *Conclusions of Law*

### A. Claim of discrimination in hiring of facilities security supervisor

■ Plaintiff first claims that defendant did not hire her as facilities security supervisor because she is a woman. As plaintiff presented only circumstantial evidence of discrimination on this claim, the court will utilize the three-step *McDonnell Douglas/Burdine* test. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). First, plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 548 (6th Cir.1991). This burden is "not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94.

To establish a prima facie case, plaintiff must prove by a preponderance of the evidence that:

    1) she is a member of a protected class;

    2) she applied and was qualified for a position for which the employer sought applicants;

    3) she did not receive the position; and

    4) the position was awarded to a man.

*Hale v. Cuyahoga County Welfare Dept.,* 891 F.2d 604, 606 (6th Cir.1989) (citing *McDonnell Douglas* and *Burdine*).

Here, plaintiff established a prima facie case of discrimination. As a woman, she is a member of a protected class. Plaintiff applied and was qualified for the supervisor position. She was rejected for that

position. And the position was awarded to Ahola, a man.

After plaintiff has established a prima facie case of discrimination, the burden of production shifts to defendant "to articulate some legitimate, nondiscriminatory reason for its action in hiring the male." *Hale,* 891 F.2d at 606. Here, defendant established that Ahola was more qualified than plaintiff for the supervisor position. *See* Finding of Fact ¶ 9. Therefore, defendant has carried its burden of production.

In the third *Burdine* step, the burden shifts back to plaintiff to prove intentional discrimination. *Hale,* 891 F.2d at 606. Plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by defendant were not its true reasons, but were instead a pretext for discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. The ultimate burden of persuading the trier of fact that defendant intentionally discriminated remains at all times with plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94.

The district court's role is not to determine which candidate, Ahola or plaintiff, should have been chosen for the job of facilities security supervisor. *Hale,* 891 F.2d at 607 (citing *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1271–72 (6th Cir. 1986)). The use of subjective criteria is permissible in the selection of candidates for employment. Employers, not the courts, ought to be able to choose which employees to hire. Rather, the ultimate issue in each case is whether the employer's subjective criteria were used to disguise discriminatory action. *Farber v. Massillon Bd. of Educ.,* 917 F.2d 1391, 1399 (6th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 952, 112 L.Ed.2d 1041 (1991).

While there was confusion when Ahola was chosen over plaintiff, the court finds no evidence that the choice of Ahola was a pretext for discrimination against plaintiff. Therefore, the court holds that plaintiff failed to prove intentional discrimination when she was not hired for the supervisor position.

B. Claims of discrimination in the job of public safety officer and retaliatory dismissal [2]

Plaintiff claims that defendant intentionally discriminated against her on the basis of sex while she was working as a PSO and terminated her for filing a complaint regarding the alleged discrimination. Title VII forbids an employer to "to discharge any individual, or otherwise to discriminate with respect to his compensation, terms, conditions, or privileges of employment," or to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex." 42 U.S.C. §§ 2000e–2(a)(1), (2).

In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the United States Supreme Court held that when a plaintiff in a Title VII case presents direct evidence of discrimination, the defendant must prove that it would have made the same employment decision even if the discrimination were absent. Justice Brennan, writing for a four-person plurality, held that when a plaintiff proves that her gender "played a motivating part" in an employment decision, the defendant must prove by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account. 490 U.S. at 244–45, 109 S.Ct. at 1787–88 (Brennan, J. plurality opinion). *Accord Zanders v. National Railroad Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir.1990).

---

2. The sequence and burden of proof applicable to disparate treatment cases are equally applicable to retaliation claims. *Zanders v. National Railroad Passenger Corp.,* 898 F.2d 1127, 1134 (6th Cir.1990). Because plaintiff alleges both disparate treatment and retaliation and the two claims are inextricably tied in this case, the court will discuss them together in this section.

Justices White and O'Connor, concurring separately, maintained that the employer's impermissible motive must play a "substantial" part in the employment decision. 490 U.S. at 259, 109 S.Ct. at 1795 (White, J., concurring); 490 U.S. at 276, 109 S.Ct. at 1804 (O'Connor, J., concurring). *Accord Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 514–15 (6th Cir.1991) (citing *Gagne v. Northwestern National Insurance Co.*, 881 F.2d 309, 315–16 (6th Cir. 1989)).

### 1. *Direct Evidence of Discrimination*

At some point in the proceedings, the trier of fact must determine whether a case fits within the *Price Waterhouse* mixed-motive model or the *McDonnell Douglas/Burdine* pretext model. 490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12 (Brennan, J., plurality opinion). "If the plaintiff fails to satisfy the factfinder that it is more likely than not that a forbidden characteristic played a part in the employment decision, then she may prevail only if she proves, following *Burdine*, that the employer's stated reason for its decision is pretextual." *Id.* According to Justice O'Connor, after the evidence is presented, the court should determine whether the *McDonnell Douglas* or *Price Waterhouse* framework properly applies. *Id.* at 278–79, 109 S.Ct. at 1805–06 (O'Connor, J., concurring).

To demonstrate direct evidence sufficient to satisfy the *Price Waterhouse* threshold, a plaintiff must show more than random and isolated comments. In the plurality opinion, Justice Brennan stated:

> Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision. In making this showing, stereotyped remarks can certainly be *evidence* that gender played a part.

*Id.* at 251, 109 S.Ct. at 1791 (Brennan, J., plurality) (emphasis in original).

Justice O'Connor, concurring with the four-Justice plurality, likewise commented that "stray remarks in the workplace ...

cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecision-makers, or statements by decision-makers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard." *Id.* at 277, 109 S.Ct. at 1804 (O'Connor, J., concurring).

In the wake of *Price Waterhouse*, the Sixth Circuit held that "a mere isolated or ambiguous comment made by a supervisory official would be insufficient to shift the burden of proof to the employer." *Gagne v. Northwestern National Insurance Co.*, 881 F.2d 309, 316 (6th Cir.1989).

Clearly, direct evidence of discrimination must concern the state of mind of the decision-maker at the time the disputed decision was made. A plaintiff must show "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1805 (O'Connor, J., concurring).

Whether particular direct evidence rises to the level that would shift the burden to the employer depends on the individual case. In *Gagne*, the Sixth Circuit held that the statement made by the plaintiff's immediate supervisor that he "needed younger blood" was insufficient to shift the burden. 881 F.2d at 314 (age discrimination case). However, in an earlier, pre-*Price Waterhouse* Sixth Circuit case, a superintendent of schools was found to have a "discriminatory frame of mind" for stating that he "needed a man ..." to be the principal of a school. *Spears v. Board of Education of Pike County, Kentucky*, 843 F.2d 882, 884 (6th Cir.1988).

Other courts have held that certain comments by individuals closely involved in employment decisions may constitute the direct evidence of discrimination envisioned by *Price Waterhouse*. *See Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir.1991) (decisionmakers stated that older employees have problems adapting to changes and to new policies); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir.1991) (person contributing to the decisionmaking

process stated that one had to be wary around "articulate black men"); *Barbano v. Madison County*, 922 F.2d 139, 143 (2d Cir.1990) (decisionmaker stated that he would not consider "some woman" for the position, questioned plaintiff about future pregnancy plans, and queried plaintiff about whether her husband would object to her "running around the country with men"); *Vaughn v. Edel*, 918 F.2d 517, 520 (5th Cir.1990) (decisionmaker stated that plaintiff was becoming "the black matriarch within Texaco"); *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1517–19 (11th Cir.1990) (decisionmaker stated that a lesser job position was sufficient for women and that no woman would be named to the higher position); *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923–25 (11th Cir.1990) (decisionmaker stated that if it was his company, he would not hire any black people); *Favors v. MAQ Management Corp.*, 753 F.Supp. 941, 946 (N.D.Ga.1990) (manager of apartment building stated that he was "not going to hire a black leasing agent").

█ In many of these cases, there was additional circumstantial evidence to support the direct evidence. Thus, while discriminatory comments might be probative of a decisionmaker's state of mind, comments alone do not make or break an employment discrimination case. *See Price Waterhouse*, 490 U.S. at 251, 109 S.Ct. at 1791 (Brennan, J., plurality opinion).

█ In this case, there was a substantial amount of direct evidence that defendant took plaintiff's sex into account in her employment and in its decision to dismiss. Fredianelli, who made the decision to terminate plaintiff, criticized plaintiff's uniform and dress even though he admitted at trial that she was helpless to change the mandatory clothes, which are designed for men to wear. Further, Fredianelli treated plaintiff differently than a male cohort when each of them committed the same infraction of the rules.

The switch from badge 33 to badge 37 was further direct evidence of discrimination. After viewing the testimony, the court is convinced that defendant has des-

ignated badge 37 as "the woman's badge." Thus, the uniform criticism, disparate treatment, and badge episode are direct evidence that Fredianelli's state of mind was affected by plaintiff's gender.

The "You have the lady's job" remark is the clearest direct evidence of Fredianelli's discriminatory intent. Plaintiff had simply asked, after learning of another officer's retirement, if she could move out of the bump shift. As an officer would presumably be hired to replace the retiring officer, the new officer would have the least seniority. Likewise, nothing in the question was inflammatory or provocative. The court can only surmise that someone infected by discriminatory animus would be "mad and upset" by such a question.

Direct evidence of discrimination usually entails a general comment about a minority group in society. The courts infer from such a remark that the defendant had discriminatory animus toward the particular plaintiff in the particular job. Here, no inference is necessary: Fredianelli's "lady's job" remark was directed specifically at plaintiff and directly related to her job. And after making the discriminatory remark, Fredianelli documented it. Thus, the remark was not an ambiguous, isolated comment without wider implications. The remark is direct evidence of Fredianelli's discriminatory state of mind toward plaintiff.

Plaintiff presented direct evidence of what was going through Fredianelli's mind during the time she worked as a PSO. I conclude, as a matter of law, that plaintiff presented substantial direct evidence that Fredianelli had unlawful intent both during plaintiff's employment and when he terminated her.

2. *Whether plaintiff would have been dismissed regardless of discrimination*

█ Because plaintiff made a showing of intentional discrimination, the burden shifts to the employer to convince the court by a preponderance of the evidence that the decision would have been the same absent consideration of the unlawful factor.

*Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. at 1795 (Brennan, J., plurality opinion); at 260, 109 S.Ct. at 1796 (White, J., concurring); at 276, 109 S.Ct. at 1804 (O'Connor, J., concurring). "The employer has not yet been shown to be a violator, but neither is it entitled to the ... presumption of good faith concerning its employment decisions. [A]t this point the employer may be required to convince the factfinder that despite the smoke, there is no fire." *Id.* at 265–66, 109 S.Ct. at 1798–99 (O'Connor, J.).

The role of the court in a discrimination case is to peer into the mind of the decisionmaker and determine what that person was thinking when he made the employment decision. Thus, unless the decisionmaker states, "I am firing you because you are a woman," the court must attempt to recreate a coherent picture of the decisionmaker's mind. This is difficult because more than one motive nearly always occupies a decisionmaker's mind. As a result, when the court finds that a substantial motivating factor of a decision was unlawful, the burden then is placed squarely on the decisionmaker's shoulders to prove that the identical decision would have been made absent the unlawful motive. *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. at 1795 (Brennan, J., plurality); at 260, 109 S.Ct. at 1795–96 (White, J., concurring); at 276, 109 S.Ct. at 1804 (O'Connor, J., concurring).

Here, a number of factors suggest that Fredianelli's discrimination terminally infected plaintiff's employment as a PSO. From the testimony, it appears that Fredianelli decided that plaintiff was going to be terminated as early as January 8, 1988, when Fredianelli failed to submit plaintiff's certification papers. At that time, there were already indications of Fredianelli's discriminatory state of mind toward plaintiff. Thus, the increase in critical notes to plaintiff's file and heightened watch over her job performance indicate that Fredianelli was simply building a file so that he would have justification to terminate plaintiff. Further, on February 11, the day he made the "lady's job" comment, Fredianelli put a note in plaintiff's file relating to her

spending too much time in the office. In her termination meeting two weeks later, Fredianelli told plaintiff she was being fired for spending too much time in the office.

On February 12, with full knowledge that plaintiff had called the EEOC, Fredianelli telephoned one of plaintiff's previous employers in Mississippi to inquire into her past. Thus, Fredianelli's decision to dismiss plaintiff was infected by his desire to retaliate for plaintiff's complaint about his acts of discrimination. *See Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir.1991) (finding that pronounced increase in negative reviews and careful scrutiny of plaintiff's performance, coupled with suggestions that management was acutely aware of plaintiff's EEOC charge, was sufficient to establish a case of retaliatory discharge). After considering these actions and viewing the witnesses at trial, it is clear to the court that Fredianelli was motivated by discriminatory animus and in the end, by a desire to retaliate against plaintiff.

The next question is whether defendant proved by a preponderance of the evidence that the employment decisions concerning plaintiff would have been identical absent the unlawful motivation. In *Price Waterhouse*, plaintiff Ann Hopkins had worked as a senior manager of Price Waterhouse, a national professional accounting firm, for five years when the partners in her office nominated her as a candidate for partnership. 490 U.S. at 231–33, 109 S.Ct. at 1780–82. She was the only woman among eighty-eight candidates considered for partnership that year. *Id.* at 233, 109 S.Ct. at 1781–82. Evidence presented at trial indicated that Hopkins was a productive, competent manager, admired and respected by the firm's clients. *Id.* at 233–34, 109 S.Ct. at 1781–82. Indeed, the trial court found that no other partnership candidate at Price Waterhouse that year had a comparable record in terms of securing business for the firm. *Id.* at 234, 109 S.Ct. at 1782. Yet, evidence also showed that several decisionmakers were concerned with Hopkins' lack of interpersonal skills. *Id.* She was impatient and harsh with staff members

and often her aggressiveness "spilled over into abrasiveness." *Id.*

Intermingled with these evaluations was evidence of sexual stereotyping of Hopkins. After she was rejected for partnership, one partner advised Hopkins to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* at 235, 109 S.Ct. at 1782. Other such discriminatory comments were injected into the decisionmaking process. Thus, there were both legitimate and illegitimate reasons for Price Waterhouse to deny Hopkins partnership.

After the case was remanded by the Supreme Court's 1989 decision, the district court had to consider whether Price Waterhouse had established by a preponderance of the evidence that it would have denied Hopkins partnership even without the sex discrimination. *Hopkins v. Price Waterhouse,* 737 F.Supp. 1202 (D.D.C.), *aff'd,* 920 F.2d 967 (D.C.Cir.1990) ("*Hopkins*").

First, the district court defined the meaning of "preponderance of the evidence." 737 F.Supp. at 1206. "Preponderance of the evidence still requires proof sufficient to *persuade* the finder of fact that the proposition is more likely true than not true." *Id.* at 1206 (emphasis in original) (citation omitted). Judge Gesell explained Price Waterhouse's task in this regard. "Price Waterhouse, having permitted discriminatory comments to be weighed in the hold decision when appraising Ms. Hopkins,

was required to separate the good from the bad." *Id.* Such separation is not an easy prospect, for the "subtle influence of sex upon a person's perceptions may vary with each observer and play both an unconscious and conscious role in influencing actions taken." *Id.*

■ This court finds itself in much the same position as the court in *Hopkins.* While defendant presented evidence that plaintiff was having difficulty in the position of public safety officer, defendant never addressed whether plaintiff's problems were only due to defendant's discrimination. As in *Hopkins,* defendant simply noted repeatedly that plaintiff was performing inadequately.[3] *See* 737 F.Supp. at 1207.

Thus, defendant never answered the question that is crucial to this case: the extent to which the discriminatory animus in Fredianelli's mind contaminated his evaluation of plaintiff. Since discrimination entered plaintiff's evaluations and treatment, and retaliation entered Fredianelli's decision to dismiss, it was defendant's burden to prove that absent such discrimination and retaliation, it would have terminated plaintiff anyway.

As in *Hopkins,* this court cannot separate the good from the bad, the times when Fredianelli's mind was infected by discrimination and the times when he treated plaintiff as he would have treated any other subordinate. Defendant bore the burden of persuading the court that sex discrimination did not infect the decision to dismiss

---

**3.** Here, defendant not only noted plaintiff's deficiencies in her job with defendant, it dredged up much of plaintiff's employment history in Mississippi. This evidence is irrelevant. Defendant knew about that history both when they hired plaintiff and during the course of her employment. However, when defendant dismissed plaintiff, it did not rely on her prior employment history. *See* Finding of Fact ¶ 30.

As the plurality explained in *Price Waterhouse,* "An employer may not ... prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it *at the time of the decision.*" 490 U.S. at 252, 109 S.Ct. at 1791–92 (emphasis supplied). When "an employer considers both gender and legitimate factors at the time of making a decision, that decision was 'because of' sex and the other, legitimate considera-

tions—even if we may say later, in the context of litigation, that the decision would have been the same if gender had not been taken into account." *Id.* at 228, 109 S.Ct. at 1775 (Brennan, J., plurality opinion).

Justice O'Connor also alluded to the state of mind of the employer at the time of the adverse employment decision. *See* 490 U.S. at 276–77, 109 S.Ct. at 1804–05. Thus, Justice Brennan, writing for the four Justice plurality, and Justice O'Connor, frame their focus on the time the employment decision was made. Reasons presented after the employment decision has been made cannot justify that decision. *See Gilty v. Village of Oak Park,* 919 F.2d 1247, 1251 n. 5 (7th Cir.1990). Therefore, now that the case has come to trial, defendant cannot rely on evidence that it did not use when it terminated plaintiff.

plaintiff. Defendant failed to carry its burden. Therefore, based on all of the above, the court concludes that defendant did in fact discriminate against plaintiff on the basis of her sex in violation of Title VII.

### 3. *Damages*

Title VII provides:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may ... order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay, ... or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g).

■ The equitable remedies awarded under Title VII have the goal of making persons whole for injuries suffered on account of unlawful employment discrimination. *Gutzwiller v. Fenik*, 860 F.2d 1317, 1333 (6th Cir.1988) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). Title VII requires that an injured person be placed as nearly as possible in the situation he would have occupied had the wrong not been committed. *Spears v. Board of Education*, 843 F.2d 882, 885 (6th Cir.1988).

■ Under its equitable power to assess damages in Title VII cases, the court will limit plaintiff's damages because of the falsification of her application. *See* Finding of Fact ¶ 33. If defendant's wrong had not been committed, plaintiff might have remained working for defendant until she retired, but she also could have been dismissed because of the falsification.

The court concludes that plaintiff would still have been hired for the PSO position even had defendant known of her conviction. The court made this conclusion based on the testimony that defendant hired another PSO shortly after plaintiff was dismissed who revealed an impaired driving conviction. *See* Finding of Fact ¶ 34. Thus, defendant did not have a strict policy of refusing to hire anyone with a drunk

driving conviction. But credible evidence did reveal a policy of firing employees who made material falsifications on their applications. *See* Finding of Fact ¶ 35.

■ The question is whether plaintiff's falsification on her application was of such materiality that it would have justified her dismissal had defendant learned about it. *See O'Driscoll v. Hercules, Inc.*, 745 F.Supp. 656 (D.Utah 1990) (employer must show that misconduct was such that an employee would have been terminated had the employer known of the misconduct. "Minor, trivial or technical infractions" would not qualify as material misconduct). In this case, the court is satisfied that the revelation of past convictions on an application is material to the job of a police officer. For example, if plaintiff had been called to testify in court on a job-related matter, she could have been impeached by her prior conviction.

Courts have found that after-discovered evidence of resume or application falsification bars a Title VII plaintiff's right to relief. *See Summers v. State Farm Mutual Automobile Ins. Co.*, 864 F.2d 700 (10th Cir.1988); *Churchman v. Pinkerton's Inc.*, 756 F.Supp. 515 (D.Kan.1991); *Mathis v. Boeing Military Airplane Co.*, 719 F.Supp. 991 (D.Kan.1989). However, *Summers* and its progeny are distinguishable from this case. In those cases, unlike here, no discrimination was found to have occurred.

In dicta, *Summers* compared the plaintiff to a doctor who was fired because of his age, race, religion, and sex, and after he filed suit, the employer discovered that the discharged "doctor" had never been to medical school. Here, the court has found that plaintiff was qualified to be a public safety officer and was discriminated against after she was hired for that position. The falsification does not alter these findings.

Defendant cites this court's opinion in *Bynum v. Michigan State University*, 117 F.R.D. 94 (W.D.Mich.1987) for the proposition that plaintiff's application falsification bars Title VII recovery. In *Bynum*, the court had dismissed the plaintiff's Title VII

case at the summary judgment stage because no evidence of discrimination existed. 117 F.R.D. at 99. Defendant moved for Rule 11 sanctions against the plaintiff and his attorneys. The court imposed sanctions against the plaintiff for certifying in his complaint that he was qualified for the job even though he had falsified his employment application. The court stated in dicta that such falsification "might" have barred Title VII recovery if the case had not been dismissed by summary judgment. 117 F.R.D. at 100. *Bynum*, like *Summers*, is distinguishable because no discrimination was found to have occurred.

I note that other courts have ignored falsifications contained in applications when there was evidence of discrimination or retaliation. *See National Labor Relations Board v. O'Hare–Midway Limousine Service*, 924 F.2d 692 (7th Cir.1991); *Moylan v. Maries County*, 792 F.2d 746, 747 (8th Cir.1986); *Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 626 (11th Cir.1983), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984); *Proulx v. Citibank, N.A.*, 681 F.Supp. 199, 203 (S.D.N.Y.1988), *aff'd without opinion*, 862 F.2d 304 (2d Cir.1988).

Exercising its equitable powers to limit damages to plaintiff, the court strikes a middle ground amidst the present case law on the application falsification issue. The court does not deny relief to a plaintiff found to have been wronged. Yet the court does not fully reward a plaintiff found to have falsified her employment application.

■ Plaintiff has requested back pay, prejudgment interest, and front pay. Back pay is presumptively favored as a make-whole remedy. *Gutzwiller*, 860 F.2d at 1333. In attempting to make plaintiff whole, the court is left with the futile task of guessing when, if ever, defendant would have discovered the falsification. The court cannot speculate as to what this date would have been. Discrimination and litigation intervened. Therefore, under its equitable power of awarding Title VII damages, the court will take the back pay plaintiff would have made in the PSO position, minus mitigation, and reduce it by fifty percent.

The parties stipulated to an amount of full back pay and benefits for the PSO position of $100,208.33. Joint Exh. 1. Plaintiff earned $31,121.59 in mitigation. Finding of Fact 33.

The total back pay damages equal $69,086.74. Because of plaintiff's application falsification, the court will halve that figure. Therefore, plaintiff will be awarded $34,543.37 in backpay.

■ The awarding of front pay is discretionary. *Spears v. Board of Education of Pike County*, 843 F.2d 882, 886 (6th Cir.1988). The court concludes that plaintiff is not entitled to front pay because of the falsification. The awarding of prejudgment interest is also discretionary. *Scales v. J.C. Bradford and Co.*, 925 F.2d 901, 909 (6th Cir.1991). The court concludes that plaintiff will not be awarded prejudgment interest because of her application falsification. *See Proulx v. Citibank, N.A.*, 681 F.Supp. 199, 205 (S.D.N.Y.1988), *aff'd without opinion*, 862 F.2d 304 (2d Cir.1988) (district court denied prevailing plaintiff in Title VII case prejudgment interest because, among other reasons, plaintiff falsified employment application).

■ The court will award attorney's fees as a part of costs. 42 U.S.C. § 1988; *Perotti v. Seiter*, 935 F.2d 761 (6th Cir. 1991). An accounting of attorney's fees and costs shall be submitted to the court on or before August 5, 1991. Defendant may respond to plaintiff's fee and costs motion on or before August 19, 1991.

In conclusion, the court has found that plaintiff was not discriminated against by defendant's failure to hire her for the position of facilities security supervisor. However, the court concludes that plaintiff was discriminated against during her employment with defendant and likewise was retaliated against after she filed a complaint regarding the discrimination. A judgment will enter awarding plaintiff $34,543.37.

## JUDGMENT AND ORDER

This action having been tried to the court, and the court having filed its findings of fact and conclusions of law,

IT IS HEREBY ORDERED AND ADJUDGED that defendant Michigan Technological University has violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000 *et seq.* Plaintiff Patricia Milligan–Jensen takes $34,543.37 on her complaint, and judgment is entered on behalf of plaintiff on Count I of plaintiff's First Amended Complaint.

IT IS FURTHER ORDERED that plaintiff shall submit on or before August 5, 1991 an accounting of attorney's fees and costs.

IT IS FURTHER ORDERED that defendant may reply to plaintiff's motion for attorney's fees and costs on or before August 19, 1991.